[No. C027742. Third Dist. Feb. 8, 1999.]

COUNTY OF MONO, Plaintiff and Respondent, v.
PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Defendant and
Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 3. and 4. of the Discussion.

1106

## COUNSEL

Kayla J. Gillan; and Richard B. Maness for Defendant and Appellant.

Rexon, Freedman, Klepetar & Hambleton, Jeffrey C. Freedman and Wendy K. Genz for Plaintiff and Respondent.

## OPINION

**DAVIS, J.**—The basic issue here is whether Mono County's Public Safety Officers (PSO's) must be granted "local safety member" classification under Mono County's contract with the California Public Employees' Retirement System (PERS). As part of their duties, PSO's supervise county jail inmates.

We conclude that the PSO's are "safety members" of PERS. We therefore reverse the trial court's determination.

### BACKGROUND

As authorized by statute, Mono County (Mono) has contracted with PERS for retirement benefits for county employees. (Gov. Code, former § 20450;

all future references to sections are to the Government Code unless otherwise indicated[1]; *City of Sacramento* v. *Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1476, fn. 2 [280 Cal.Rptr. 847].) By choosing to contract with PERS, Mono is subject to the statutory scheme governing PERS benefits (the Public Employees' Retirement Law, or PERL). (Former § 20000 et seq.; *Tuolumne County Deputy Sheriffs' Assn.* v. *Board of Administration* (1989) 209 Cal.App.3d 1236, 1238 [257 Cal.Rptr. 824]; *Oden* v. *Board of Administration* (1994) 23 Cal.App.4th 194, 201 [28 Cal.Rptr.2d 388] (*Oden*) [statutes defining the scope of PERS compensation cannot be qualified by bargaining agreements].) PERL classifies covered local agency employees as either "local miscellaneous" or "local safety" members, depending on their typical duties. (Former §§ 20018, 20019; *Tuolumne County Deputy Sheriffs' Assn., supra.*) Generally, safety members are entitled to better retirement benefits than miscellaneous members. (*Tuolumne County Deputy Sheriffs' Assn., supra.*)

Under PERL, "county peace officers" are classified as safety members. (Former §§ 20019, 20021.5.) In late 1973, PERS questioned whether the position of Mono County Deputy Sheriff I—a position that worked in county correctional facilities—met the definition of "county peace officer." PERS then reclassified the Deputy Sheriff I position from a safety member to a miscellaneous member.

Mono protested this reclassification, noting that Deputy Sheriff I's were fully trained and certificated deputy sheriffs who had always been classified and hired as safety members. PERS noted that PERL allowed counties, at their election, to amend their contracts with PERS to include "jailer and matron type employees" as "county peace officers" (and thus entitle them to safety member status). Mono opted for this amendment.

In 1974, Mono amended its contract with PERS to include the following language recommended by PERS:

"6. The following additional provisions of the [PERL] which apply only upon election of a contracting agency shall apply to [Mono] and its employees:

"a. County Peace Officers shall participate as local safety members . . . .

"b. 'County Peace Officer' shall include persons employed on and after July 1, 1974, in positions described in Section 20021.9 (providing for the

---

[1] The PERS statutory scheme was recodified without substantive change effective January 1, 1996. (Stats. 1995, ch. 379.) Statutory references are to the former PERS statutes that apply here.

participation of those employees of the Sheriff employed in [a] county jail, detention or correctional facility and having as their primary duties and responsibilities the supervision and custody of persons committed to such facility)."

This is the language at issue in these proceedings.

In 1982, Mono conducted an employee classification study through a consultant, Ralph Anderson and Company. To reduce the cost of staffing the county jail with sworn deputy sheriffs, Mono adopted that study's recommendation to create a civilian (nonsworn) sheriff position of PSO. PSO's have three basic functions: dispatch; care and control of evidence and records; and supervision and custodial duties regarding county jail inmates (under the ultimate supervision of a sworn sheriff jail commander). Mono has always classified PSO's as miscellaneous members.

In January of 1993, PERS determined, in accordance with former section 20021.9 and the Mono-PERS contract incorporating that section, that the PSO's should have been (and should be) classified as safety members; PERS noted that adjustments in both the employer and employee accounts would have to be made retroactively. (Former section 20021.9 [now section 20439] defines "county peace officer" to include jail employees whose primary duty is the supervision and custody of jail inmates, whether or not the employees are deputized.) An administrative law judge (ALJ) and the PERS Board of Administration, in adopting the ALJ's decision, upheld this determination.

Mono petitioned for a writ of administrative mandate. (Code Civ. Proc., § 1094.5.) Independently reviewing the administrative record, the trial court granted the petition and directed PERS to deny safety member status to the PSO's. The trial court ruled against PERS on a host of independently dispositive issues. The court concluded that former section 20021.9—as incorporated into the Mono-PERS contract through the 1974 amendment— did not apply to the PSO's. The court also found that the PSO's' "primary duty"—the former section 20021.9 touchstone—was not the supervision and custody of jail inmates. The court added that estoppel, laches, and the statute of limitations foreclosed PERS from making its safety member determination.

### DISCUSSION

1. *The Meaning of Former Section 20021.9 in the Mono-PERS Contract*

 The trial court concluded that former section 20021.9—as incorporated into the Mono-PERS contract through the 1974 amendment—did not apply to the PSO's. We disagree.

As noted, pursuant to the following language recommended by PERS, Mono amended its PERS contract in 1974 to incorporate former section 20021.9:

"6. The following additional provisions of the [PERL] which apply only upon election of a contracting agency shall apply to [Mono] and its employees:

"a. County Peace Officers shall participate as local safety members . . . .

"b. 'County Peace Officer' shall include persons employed on and after July 1, 1974, in positions described in Section 20021.9 (providing for the participation of those employees of the Sheriff employed in [a] county jail, detention or correctional facility and having as their primary duties and responsibilities the supervision and custody of persons committed to such facility)."

Former section 20021.9 provided in relevant part:

" 'County peace officer' . . . include[s] employees of the sheriff employed in a county jail, detention or correctional facility and having as their primary duty and responsibility the supervision and custody of persons committed to such jail or facility, whether or not such employees are deputized. It shall not include persons employed as clerks, typists, teachers, instructors, psychologists or to provide food, maintenance, health or supporting services, even though responsibility for custody and control of persons so committed may be incident to, or imposed in connection with, such service or the employees are deputized.

"The provisions of this section shall not apply to the employees of any contracting agency nor to any such agency unless and until the contracting agency elects to be subject to the provisions of this section by amendment to its contract with [PERS], made as provided in Section 20461.5 or by express provision in its contract with [PERS]."

PERS contends the language of the 1974 amendment incorporating the former section 20021.9 definition is clear, and includes within its ambit the PSO's; judicial interpretation is therefore unnecessary.

The trial court rejected PERS's contention that the language of the 1974 amendment is clear, and considered extrinsic evidence on its application. Mono tendered extrinsic evidence to show that Mono and PERS intended the 1974 amendment to apply to sworn deputy sheriffs working as jailers, and

had nothing to do with the PSO's (a position not even contemplated until eight years after the 1974 amendment). We conclude the trial court erred in this respect and that PERS's contention is correct.

Through the 1974 amendment, Mono elected to incorporate the former section 20021.9 definition of "county peace officer" into its contract with PERS. "Any such election so made by amendment to the contract shall be irrevocable until the contract is terminated." (Former § 20461.5 [now § 20474].) Mono has not terminated its contract with PERS; indeed, it has reincorporated the former section 20021.9 definition into the contract on at least six occasions from 1980 through 1992. Former section 20021.9 defines "county peace officer" to include sheriff employees employed in a county jail, detention or correctional facility who have as "their primary duty and responsibility the supervision and custody of persons committed to such jail or facility, whether or not such employees are deputized." This statutory definition includes the PSO's—who are sheriff employees employed in the county jail—if their primary duty is the supervision and custody of persons committed to the jail (a question we explore in the next section of this opinion).

Mono claims the 1974 amendment incorporating the statutory definition of former section 20021.9 was intended to apply to sworn deputy sheriffs working as jailers and had nothing to do with the PSO position (a position not even created until 1982). The reason for the 1974 amendment was that PERS had reclassified the then deputy sheriff-jailer from a safety member to a miscellaneous member, and Mono wanted all of its sworn deputy sheriffs to be safety members.

Mono's claim, however, runs afoul of the explicit definition contained in former section 20021.9; this statutory definition still binds Mono because the contract containing it is still in force. (See former §§ 20021.9, 20461.5.) "A contract with PERS subjects the contracting agency to the [PERL] 'and all amendments thereto applicable to members, local miscellaneous members, or local safety members except such as are expressly inapplicable to a contracting agency unless and until it elects to be subject to such provision.' (§ 20493 [now § 20506].)" (*City of Sacramento* v. *Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 791 [27 Cal.Rptr.2d 545].) Whether a local agency employee legally falls within a statutory definition that is incorporated into the local agency's contract with PERS, is a question of statutory interpretation. (*Crumpler* v. *Board of Administration* (1973) 32 Cal.App.3d 567, 576-577 [108 Cal.Rptr. 293]; *Schaeffer* v. *Public Employees' Retirement System* (1988) 202 Cal.App.3d 609, 612 [248 Cal.Rptr.

647].) Furthermore, statutes defining the scope of PERS benefits cannot be qualified by bargaining agreements. (*Oden, supra,* 23 Cal.App.4th at p. 201.)

It is true that Mono can elect not to adopt the definition of "county peace officer" set forth in former section 20021.9. (Former § 20021.9.) Mono *did* elect to do so. Having done so, Mono can escape former section 20021.9's definition only by terminating the contract. (Former § 20461.5.)

Finally, in line with evidence that Mono had tendered, the trial court interpreted the 1974 amendment as applying to sworn deputy sheriffs working as jailers but not to PSO's. For this interpretation, the court implicitly relied on the contractual interpretive principle that extrinsic evidence is admissible to interpret a written instrument if that evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Horsemen's Benevolent & Protective Assn.* v. *Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1559 [6 Cal.Rptr.2d 698]; *Roddenberry* v. *Roddenberry* (1996) 44 Cal.App.4th 634, 645-646 [51 Cal.Rptr.2d 907].) There are two problems with this approach, however. The first one is that we are dealing, ultimately, with the interpretation of a statute rather than with the interpretation of a written instrument. Secondly, even assuming for the sake of argument that this interpretive principle can apply to statutory interpretation (see *City of Sacramento* v. *Public Employees' Retirement System, supra,* 22 Cal.App.4th at pp. 790, fn. 3, 792-797), Mono's proffered evidence that sworn deputy sheriffs were to be *in*cluded in the former section 20021.9 incorporation is not evidence that the PSO's were to be *ex*cluded. In any event, there is no "semantically permissible reading" of the former section 20021.9 incorporation in the Mono-PERS contract "by which to achieve the result" sought by Mono. (*Id.* at p. 794.)[2]

We conclude that former section 20021.9—as incorporated originally into the Mono-PERS contract through the 1974 amendment—applies to the PSO's, if the PSO's' primary duty is the supervision and custody of jail inmates (for simplicity, we use the term "jail inmates" to refer to those persons committed to jail, detention or correctional facilities as specified in former section 20021.9). We turn to that "primary duty" issue now.

---

[2]Nor is *Boxx* v. *Board of Administration* (1980) 114 Cal.App.3d 79 [170 Cal.Rptr. 538] of any assistance to Mono. In *Boxx,* the local agency and PERS were allowed to amend their contract because both entities had clearly intended to cover all of the agency's employees, but by mutual error one group of agency employees was misclassified. (114 Cal.App.3d at pp. 81, 88-89.) The evidence here does not show such clear intent and mutual error. PERS simply informed Mono that by amending their contract, Mono could include jailer employees as "county peace officers" entitled to safety member status.

### 2. *Primary Duty of PSO's*

The trial court found that the PSO's' "primary duty"—the former section 20021.9 touchstone—was not the supervision and custody of jail inmates. We conclude there is insufficient evidence to support this finding.

The trial court's role regarding this issue was to exercise its independent judgment on the evidence. (See *Mansell* v. *Board of Administration* (1994) 30 Cal.App.4th 539, 543-544 [35 Cal.Rptr.2d 574].) Our task in this regard is to review the record to determine whether the trial court's findings are supported by substantial evidence. (*Id.* at p. 544.) " 'The trial court's decision should be sustained if it is supported by credible and competent evidence.' " (*Ibid.*) The trial court's finding regarding primary duty is not supported by credible and competent evidence.

As noted, PSO's have three basic functions: dispatch; care and control of evidence and records; and supervision and custodial duties regarding jail inmates (under the ultimate supervision of a sworn sheriff jail commander). However, the evidence is clear and uncontroverted that the PSO's' "primary duty" is the supervision and custody of jail inmates.

A parade of former and current PSO's testified that the supervision and custody of jail inmates is the "main function," the "first and foremost duty," the "primary function" and the "primary duty" of a PSO; carrying out this duty occupies 50 to 70 percent of the PSO's' work time. The trial court discounted this testimony because it was self-serving and not submitted with supporting time records. However, this testimony was never rebutted. Furthermore, Mono's current undersheriff testified that a PSO's "primary responsibility" is the supervision and custody of jail inmates. Moreover, Mono's current sheriff noted that the PSO position was created to replace the deputy sheriffs who had once worked in the jail (but were now used exclusively in the field).

A chart of "Jail Division Staffing Trends for Mono County" shows that in 1982 the jail personnel consisted of one jail commander and nine correctional officers. In 1983, when the PSO's came on board, the jail personnel encompassed one jail commander, one supervising PSO, and nine PSO's. The number of PSO's had increased to 12 by 1987. A March 1994 letter from the undersheriff to the county counsel estimates that PSO's assigned as jailers spend about 95 percent of their time on the supervision and custody of inmates.

In the face of this extensive and uncontroverted evidence, the trial court chose to base its finding regarding "primary duty" on the written job

description for the PSO position. That job description simply lists all the PSO duties, without specifying how much time will be spent on each task. Even this job description, though, places the supervision of jail inmates at the top of the listed tasks.

We conclude there is insufficient evidence to support the trial court's finding that a PSO's "primary duty" is not the supervision and custody of jail inmates. The record is clear that supervision and custody of jail inmates *is* the PSO's "primary duty." Accordingly, PSO's come within the statutory definition of "county peace officer" set forth in former section 20021.9.

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . .

### 5. *Statute of Limitations*

■ The trial court determined that PERS was barred under the three-year statute of limitations of either former section 20181, subdivision (b), or Code of Civil Procedure section 338, subdivision (a), from claiming that PSO's are safety members and from seeking retroactive contributions on that basis (at least outside this three-year period). We disagree.

The issues here are whether PERS has timely made its reclassification claim and, if so, how far back it can go to correct the classification of the PSO's, who have been classified as miscellaneous members instead of as safety members since 1982. We conclude that PERS has timely made its reclassification claim and that it can make the correction from 1982 onward.[3]

Three PERL statutes are implicated. They are the statute of limitations section set forth in former section 20181, subdivision (b), and the two sections on retroactive correction—former sections 20180 and 20165.

Former section 20181 stated in relevant part:

"(b) For the purposes of payments into or out of the retirement fund for adjustment of errors or omissions, whether pursuant to Sections 20165, 20180, or 20527 [not relevant here], or otherwise, the period of limitation of actions shall be three years, and shall be applied as follows:

---

*See footnote, *ante*, page 1105.

[3]Our decision is limited to the PSO's, as was PERS's formal determination in January 1993 and the ALJ's decision that PERS adopted as its own decision in 1995.

"(1) In cases where the system makes an erroneous payment to a member or beneficiary, the system's right to collect shall expire three years from the date of payment.

"(2) In cases where the system owes money to a member or beneficiary, the period of limitations shall not apply.

"(3) In cases where payment is erroneous because of the death of the retired member or beneficiary or because of the remarriage of the beneficiary, the period of limitation shall commence with the discovery of the erroneous payment.

"(c) Notwithstanding subdivision (b), where any payment has been made as a result of fraudulent reports for compensation made, or caused to be made, by a member for his or her own benefit, the period of limitation shall be 10 years and that period shall commence either from the date of payment or upon discovery of the fraudulent reporting, whichever date is later.

"(d) The board shall determine the applicability of the period of limitations in any case, and its determination with respect to the running of any period of limitation shall be conclusive and binding for purposes of correcting the error or omission."[4]

Former section 20180 provided in pertinent part:

"(b) . . . [PERS] shall correct all actions taken as a result of errors or omissions of . . . any contracting agency, . . . or this system.

. . . . . . . . . . . . . . . . . . . . . . . .

"(e) Corrections of errors or omissions pursuant to this section shall be such that the status, rights, and obligations of all parties described in subdivisions (a) and (b) [which include active and retired members, beneficiaries, contracting agencies and PERS itself] are adjusted to be the same that they would have been if the act that would have been taken, but for the error or omission, was taken at the proper time. However, notwithstanding any of the other provisions of this section, corrections made pursuant to this section shall adjust the status, rights, and obligations of all parties described in subdivisions (a) and (b) as of the time that the correction actually takes place if the board finds any of the following:

---

[4]Subdivision (d) of former section 20181 does not apply here. PERS never specifically determined the applicability of the period of limitations.

"(1) That the correction cannot be performed in a retroactive manner.

"(2) That even if the correction can be performed in a retroactive manner, the status, rights, and obligations of all of the parties described in subdivisions (a) and (b) cannot be adjusted to be the same that they would have been if the error or omission had not occurred.

"(3) That the purposes of this part will not be effectuated if the correction is performed in a retroactive manner."

Former section 20165 provided in pertinent part: "No adjustment shall be made because less than the correct amount of normal contributions was paid by a member if the board finds that the error was not known to the member and was not the result of erroneous information provided by him to the system or to his employer and such failure to adjust will not preclude action under Section 20180 correcting the date upon which the person became a member."

The statute of limitations language of former section 20181 does not apply here. This is not a case where PERS has made an erroneous payment to a member or beneficiary (subd. (b)(1)); or where PERS owes money to a member or beneficiary, at least at this juncture (subd. (b)(2)); or where an erroneous payment has been made because of death or remarriage (subd. (b)(3)); or where payment has been made as a result of a fraudulent report (subd. (c)). Instead, this is a case where PERS seeks to reclassify PSO's as safety members and to retroactively assess Mono and the PSO's the difference in contributions between miscellaneous and safety membership.

Since PERL does not set forth a specific statute of limitations that applies here, PERS's claim for reclassification and retroactive contributions is governed by the general statute of limitation provisions set forth in the Code of Civil Procedure. As Code of Civil Procedure section 312 recognizes: "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute."

The applicable statute of limitations here is the three-year period set forth in Code of Civil Procedure section 338, subdivision (d), for "[a]n action for relief on the ground of . . . mistake." (See *County of Marin Assn. of Firefighters* v. *Marin County Employees Retirement Assn.* (1994) 30 Cal.App.4th 1638, 1651-1652 [36 Cal.Rptr.2d 736] (*County of Marin*).) "The cause of action [under section 338, subdivision (d)] is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the . . . mistake." (Code Civ. Proc., § 338, subd. (d).)

*County of Marin* is similar to the present matter. In *County of Marin,* it was determined that "holiday pay" had been mistakenly excluded—since 1975—as an element of compensation in computing retirement benefits for county firefighters. The county retirement board then claimed that the county firefighters had to pay arrears contributions, retroactively to 1975, to compensate for the failure to deduct from the firefighters' paychecks the pension contributions based on the holiday pay.

The *County of Marin* court upheld the retirement board's claim and concluded that Code of Civil Procedure section 338, subdivision (d), provided the statute of limitations. (30 Cal.App.4th at pp. 1644, 1650-1653.) The *County of Marin* court likened the retirement board's request for retroactive contributions to a claim for recovery of public moneys paid out through mistake, a claim deemed subject to the three-year statute of limitations of Code of Civil Procedure section 338, subdivision (d), under the authority of *People* v. *Union Oil Co.* (1957) 48 Cal.2d 476, 483 [310 P.2d 409]. (30 Cal.App.4th at pp. 1651-1652.) Said *County of Marin:* "The money was paid out in the form of salary to the employees. The mistake was in the failure to include holiday pay as an element of compensation and the consequent failure to deduct contributions for holiday pay from employee paychecks. . . . Like the mistake at issue in *Union Oil,* the mistake here at issue 'is not a mere incident to [the] right to recovery. Rather it is the very basis or gravamen of [the right of] action.' " (*County of Marin, supra,* 30 Cal.App.4th at p. 1652.) Much the same can be said here regarding PERS's claim for reclassification and retroactive contributions covering the contributory differences between PSO's as miscellaneous members and PSO's as safety members. (See *Campbell* v. *Board of Administration* (1980) 103 Cal.App.3d 565, 567 [163 Cal.Rptr. 198] (*Campbell*).)[5]

The question then becomes whether PERS met the three-year statute of limitations set forth in Code of Civil Procedure section 338, subdivision (d). It did. The evidence shows that PERS discovered the mistaken classification of the PSO's in July of 1990, while conducting for Mono a general training session on membership and payroll reporting. Within three years of this date—January 8, 1993, to be exact—PERS formally determined that PSO's were safety members and notified Mono that adjustments in both employer and employee accounts would have to be made retroactively.

---

[5]Like the retirement board in *County of Marin,* PERS here never actually filed a court action seeking reclassification or the corresponding retroactive contributions. Rather, like the retirement board in *County of Marin,* PERS made an administrative determination regarding reclassification and retroactive contributions and that determination was then challenged in a formal court action. (*County of Marin, supra,* 30 Cal.App.4th at pp. 1643-1645, 1652-1653.)

The firefighters in *County of Marin* also argued that Code of Civil Procedure section 338, subdivision (d), limited the retirement board's recovery to three years of contributions prior to the date the board determined that "holiday pay" should have been included in compensation for pension purposes. (*County of Marin, supra*, 30 Cal.App.4th at pp. 1644, 1653.) The court in *County of Marin* disagreed, noting: "The effect of [Code of Civil Procedure section 338,] subdivision (d) is to delay *accrual* of the cause of action, and it requires filing of suit within three years of accrual. So long as this requirement is satisfied, subdivision (d) does not in any way limit a plaintiff's ability to recover for events that occurred more than three years prior to accrual or filing." (*Ibid.*, italics in original.)

Mono makes a similar argument here, asserting that PERS "can seek retroactive status only for a period of three years prior to its formal determination in 1993" that PSO's are safety members. Mono's argument meets a similar fate as the firefighters' argument in *County of Marin*. Mono is mixing the "apple" of statute of limitations (concerning *whether* a claim can be made because of a timeliness requirement) with the "orange" of retroactive relief (concerning *what* can be obtained pursuant to that claim). As noted, PERS has timely made its claim—doing so within three years of discovering that the PSO's were mistakenly classified as miscellaneous members instead of as safety members. PERS can now seek the relief to which it is entitled under its claim unbridled by the statute of limitations requirement.

Finally, the following language of former section 20165 cannot be used to obtain the gain of safety status without the pain of retroactive contributions: "No adjustment shall be made because less than the correct amount of normal contributions was paid by a member if [PERS] finds that the error was not known to the member and was not the result of erroneous information provided by him to the system or to his employer . . . ."

This part of former section 20165 was at issue in *Campbell, supra*, 103 Cal.App.3d 565. In *Campbell*, PERS had misclassified bailiffs as miscellaneous members instead of as safety members. PERS reclassified the bailiffs as safety members and retroactively assessed each party the difference in contributions that would have been made by the bailiffs as safety members. The bailiffs sought relief from the retroactive assessments under this language of former section 20165. The *Campbell* court upheld PERS's determination that this language applies only to minor clerical, mechanical, or other errors made by PERS in calculating a member's "normal contribution," and not to the more substantive error of misclassification. (103 Cal.App.3d at pp. 567-571.)

The court in *Campbell* applied former section 20180 to allow PERS to reclassify the bailiffs retroactively and then to assess them for the differences in their respective past contributions. (103 Cal.App.3d at p. 571; see *Button* v. *Board of Administration* (1981) 122 Cal.App.3d 730, 736 [176 Cal.Rptr. 218].) Former section 20165 provides a procedure by which the required corrections specified in former section 20180 can be made. (See *Campbell, supra,* 103 Cal.App.3d at p. 571; see also former §§ 20180, 20165.) Former section 20180 applies to retired members as well as to active. members, and applies equally to postretirement changes in status. (*Button, supra,* 122 Cal.App.3d at p. 737.)

In sum, under the applicable statute of limitations (Code Civ. Proc., § 338, subd. (d)) PERS timely sought reclassification and retroactive contributions. Under the applicable retroactive correction statutes (former §§ 20180, 20165), PERS can obtain retroactive contributions covering the difference between miscellaneous membership and safety membership.[6]

## DISPOSITION

The judgment is reversed. Each party to pay its own costs on appeal.

Blease, Acting P. J., and Puglia, J.,* concurred.

---

[6]As PERS notes in its opening brief: "If [PERS] . . . prevail[s], the affected individuals [will] be given the option to retain their miscellaneous status if they so desire. (Former § 20019.51.) With respect to individuals who opt for safety status, the individuals as well as the employer [will] be required to pay their share of retroactive and prospective safety contributions . . . . (§ 20165.) [¶] With respect to retroactive contributions, the employees [will] be given the option to pay either in a lump sum or subject to a payment schedule (payroll deduction). Former . . . PSOs currently receiving a retirement allowance [will] also be given the option to pay through an adjustment in their retirement allowance rather than in a lump sum." (Some citations and fn. omitted.)

*Retired Presiding Justice of the Court of Appeal, Third District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.