[No. C035486. Third Dist. Jan. 9, 2002.]

CITY OF OAKLAND, Plaintiff and Appellant, v.
PUBLIC EMPLOYEES' RETIREMENT SYSTEM et al., Defendants and Appellants;
UNITED PUBLIC EMPLOYEES' LOCAL 790, etc., Real Party in Interest and Appellant.

30

**COUNSEL**

Liebert, Cassidy & Whitmore, Cynthia O'Neill and Michael N. Westheimer for Plaintiff and Appellant.

Richard B. Maness for Defendants and Appellants.

VanBourg, Weinberg, Roger & Rosenfeld, W. Daniel Boone, Eric Borgerson and M. Suzanne Murphy for Real Party in Interest and Appellant.

## OPINION

**MORRISON, J.**—This case involves the retroactive reclassification of local government employees from "miscellaneous" to "firefighter," a safety membership which earns better pension benefits. (See Gov. Code, §§ 20370, subd. (c), 20420, 20433; further undesignated section references are to this code.)

We agree with the trial court that the employees in this case were "firefighters" as defined by statute. We also agree with the trial court's view it was bound by one of our prior decisions to conclude the employees were entitled to no relief because of a statute of limitations purportedly applicable to reclassification of employees subject to the Public Employees' Retirement Law (PERL). (§ 20000 et seq.) (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) The trial court exercised its right to explain why it believed our prior opinion was incorrect. (See *People v. Musante* (1980) 102 Cal.App.3d 156, 159 [162 Cal.Rptr. 158] (conc. opn. of Gardner, P. J.).) We agree with the trial judge that our prior opinion was in error. Accordingly, we shall reverse with directions.

### BACKGROUND

"The Public Employees' Retirement Law (Gov. Code, § 20000 et seq.) establishes a retirement system for certain state and local government employees. PERS was enacted 'to effect economy and efficiency in the public service by providing a means whereby employees who became superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees, and to that end provide a retirement system consisting of retirement compensation and death benefits.' (§ 20001.) City employees become members of PERS when their employing city elects, via contract with the PERS Board, to have them covered by PERS. [Citations.] [¶] Under PERS, a city employee who is a member of the system may be classified as either 'local miscellaneous' [citation] or 'local safety' [citation], depending on the nature of the principal tasks and duties of the employee's position. The distinction between the two classifications is important, as local safety members receive superior retirement benefits compared to those received by local miscellaneous members." (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 466 [14 Cal.Rptr.2d 514, 841 P.2d 1034], fn. omitted.)

In 1976, the City of Oakland (City) contracted with the California Public Employees' Retirement System (PERS) to expand its PERS membership to include "local safety" members. The City operates the Oakland Fire Department. A City agency, the Port of Oakland, operates Oakland International

Airport. As a condition of federal aviation regulations, the airport operated a unit of employees called "Airport Servicemen" (Servicemen), who were classified as "local miscellaneous" members. In 1995, based on certain duties they perform, the Servicemen, through their labor organization, sought to be reclassified as "safety" members, especially for the purposes of this appeal, as "local firefighters." (See § 20433.) If successful, this application shall entitle the Servicemen to better pension benefits. The City opposed the request for reclassification. Pursuant to a memorandum of understanding (MOU), the position was abolished in 1997 and existing incumbents either transferred into the Oakland Fire Department or into a new classification.

The City employed Servicemen since 1953.

It appears the 1997 MOU and the 1995 reclassification application were inspired by a February 1995 labor arbitration decision (confirmed by the Alameda County Superior Court) which concluded the City failed to provide necessary safety equipment and training to the Servicemen. The award concluded that by virtue of their duties and federal aviation regulations, the Servicemen were safety employees. Based in part on this award, the Servicemen filed an application for reclassification in August 1995.

The City at first opposed the application on two—and only two—grounds: First, because the Servicemen were not part of the Oakland Fire Department, they were not firefighters; second, because they did not fight fires except occasionally, they were not firefighters.

PERS opposed the application, but only in part. PERS agreed with the Servicemen that an employee did not have to be called a firefighter, nor work for a "fire department" in order to be a firefighter as defined by statute. PERS urged the Servicemen were not firefighters, at least not before 1993, when they spent a lot of time fueling aircraft. PERS argued: "After the fueling duties were abandoned, it appears that the principal duties of this position constituted active firefighting, and that since they had no other principal duties, they can be deemed to be in a de facto fire department which makes them eligible for coverage as local firefighter members of CalPERS under section 20433 for that period."

A nine-day administrative hearing took place.

In a closing brief, the City raised some new issues: First, prior requests for reclassification had not been appealed to the PERS Board; second, any reclassification could not be retroactive beyond 1988 (the date of a telephonic denial of reclassification); and third, reclassification could not apply

to labor performed before 1993, due to the three-year mistake statute, as well as a statute limiting actions for payments into and out of the PERS fund.

In January 1998, an administrative law judge (ALJ) concluded the Servicemen were "entitled to CalPERS 'local firefighter' safety status under section 20433, retroactive to July 1, 1976."

The ALJ addressed timeliness issues as follows:

"10. The City suggests that the right of Airport Servicemen to retroactive adjustment of their benefits is limited. This is because they earlier petitioned CalPERS for safety status and were denied. No appeal was taken of these earlier decisions. It is argued that Local 790 is foreclosed from challenging PERS previous decisions since it failed to exhaust its administrative remedies in prior proceedings. (Nicholson v. Lucas (1994) 21 Cal.App.4th 1657 [26 Cal.Rptr.2d 778]; Los Angeles County Employee Association v[.] County of Los Angeles (1976) 61 Cal.App.3d 926 [132 Cal.Rptr. 807]; Hittle v. Santa Barbara County Employees Retirement Assn. (1985) 39 Cal.3d 374 [216 Cal.Rptr. 733, 703 P.2d 73].)

"While there may have been separate inquiries by individual Airport Servicemen in the past, some retired, Local 790's application for safety status was not formally made until August 1995. An inquiry to CalPERS made by an attorney on behalf of retired Airport Servicemen would not preclude the instant application for change in status.

"Nicholson is inapplicable to these facts, and both the Los Angeles County and Hittle decisions can be distinguished. In the former case, petitions for writ of mandate were dismissed on the ground that the employees had not exhausted administrative remedies prior to seeking relief in the courts. Here, neither Airport Servicemen nor Local 790 have sought judicial review. Hittle found that there was no failure to exhaust administrative remedies where the notice to the employee informing him of his rights was ambiguous and uninformative. Local 790 suggests that here, in the absence of a formal decision and notice of appeal rights, Airport Servicemen are not precluded from seeking reclassification to local firefighter status because of earlier inquiries. Local 790 is not precluded from applying for reclassification in these proceedings.

"11. The City further argues that this action is subject to a three-year statute of limitation because it essentially seeks to enforce a statutory duty and/or to obtain relief on ground of mistake.

"The statute of limitations contained in Government Code section 20164(b) applies to erroneous payments into or out of the retirement fund,

not to reclassifications. The three[-]year statute of limitations in the Code of Civil Procedure is also inapplicable. Government Code section 20164(a) provides that CalPERS' obligations to its members 'continue throughout their respective memberships' and its obligations to retired members continue throughout the lives of the retired members, and thereafter until all obligations to their respective beneficiaries, if any, have been discharged. To the extent that the two statutes conflict, the more specific language in the retirement statute should govern. CalPERS also notes that section 20164 is a substantive statute creating an ongoing duty to properly discharge its obligations. The procedural statute of limitations does not appear to override this duty.

"12. Airport Servicemen are not entitled to prospective safety status classification. As a result of the reorganization, this position will no longer exist. Incumbents will be given a choice of applying as entry-level firefighters, or assuming a newly developed position entitled 'Airport Operations Specialist.' Those becoming entry-level firefighters will be entitled to PERS safety status. Airport Operations Specialists will have no basis for claiming PERS safety status. After review of all the evidence and legal arguments, and by reason of the foregoing discussion, it is determined that Airport Servicemen are entitled to CalPERS 'local firefighter' safety status under section 20433, retroactive to July 1, 1976." (Underscoring in original, fn. omitted.)

The City urged the PERS Board to reject the ALJ's decision. In part, the City urged:

"The Airport Servicemen classification has existed at the Oakland Airport since July 1, 1953. PERS Safety Status was first available in the City of Oakland in 1976. In the twenty years since then, CalPERS has consistently excluded Airport Servicemen from Safety Status, despite three separate opportunities after 1976 to review this status. During that entire period, the Port of Oakland has made retirement contributions on behalf of Airport Servicemen in reliance on CalPERS' determination of miscellaneous status. (Fn. omitted.) [¶] . . . [¶]

"Adoption of the proposed decision would create an enormous unfunded liability. The actual cost to the Port of such a drastic change in interpretation is likely to be huge, with thirty-five employees in this classification at the time of hearing, and twenty years of history. Ironically, this new liability would be created by the very agency upon whose original and repeated determinations the Port relied in funding only miscellaneous retirement

status. Even more daunting is the potential cost of a new interpretation, not limited to airport fire personnel, but extended to the numerous other employees who perform the task of law enforcement or firefighting, but who don't work in an established police, fire, or public safety department, or any of the other identified departments set forth in the various statutes. If this change is to be implemented, it should be implemented legislatively, and prospectively, rather than by adjudicative action, retroactively."

In April 1998, after a PERS Board member used a "quacks like a duck" analogy to show it is more important *to be* a firefighter than *to be called* a firefighter, the Board adopted the ALJ's written decision as its own decision.

The City filed a petition for writ of mandate to overturn the PERS Board's decision, contesting whether the Servicemen qualified as "firefighters," and whether a statute of limitations barred the relief they sought.

At argument in the trial court, the City offered yet another theory: PERS was free to reclassify the Servicemen, but PERS could not seek any money (retroactive retirement contributions) from the City to pay for it. PERS argued that each contracting agency had a specific account within PERS and PERS had no other lawful way to fund a reclassification of the City's employees than by exacting retroactive contributions from the City. The latter view accords with the mandate that PERS remain actuarially sound. (See *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 781-791 [189 Cal.Rptr. 212].)

In a frank exchange with counsel, and in his written ruling, the trial court agreed with the PERS Board, both as to the Servicemen's status as "firefighters" and as to their claim of entitlement to reclassification. However, the trial court felt bound by a statute of limitations holding in one of our prior opinions, discussed more fully below, with which the trial court disagreed. (*County of Mono v. Public Employees' Retirement System* (1999) 69 Cal.App.4th 1105 [82 Cal.Rptr.2d 130] (*County of Mono*).) Based on *County of Mono*, the trial court concluded reclassification was barred by a three-year statute of limitations applicable to civil actions based on mistake. (Code Civ. Proc., § 338, subd. (d) (the mistake statute).) The trial court found a 1988 inquiry by a union representative triggered this statute. We append the relevant text of the trial court's ruling to this opinion.

The Servicemen and PERS appealed from the judgment granting the petition, and the City filed a protective cross-appeal. We reverse with directions.

DISCUSSION

First we will discuss whether a statute of limitations bars the administrative reclassification proceeding in this case. Next, we will discuss the merits of the application to reclassify the Servicemen as firefighters. We find the trial court correctly concluded the PERS Board properly deemed the application to reclassify to be timely and the trial court correctly concluded the PERS Board properly found the application to reclassify the Servicemen had merit.

I.

 The trial court found the mistake statute was triggered by telephone calls in 1988 regarding the duties the Servicemen performed.

According to handwritten sheets of notepaper in the record, in 1988 some phone calls took place between a PERS employee and persons representing the City and the Servicemen; the PERS employee concluded that because the Servicemen did not work for the Oakland Fire Department, they were not firefighters. No written indicia of any formal action by PERS appears in the administrative record. There is also a 1979 letter to an attorney, referring to prior contacts, stating Servicemen do not qualify as firefighters and "we give notice of your appeal rights, if you wish to litigate it." It is not clear from the face of the letter whom the attorney represented. The City implies he was representing all of the Servicemen, but PERS and the Servicemen, pointing to other parts of the record, demonstrate he was representing four *retired* Servicemen, at least some of whom had retired before the 1976 contract amendment extended safety coverage to City employees. In any event, the City did not allege the 1979 letter as a "discovery" fact in its mandamus petition, so the matter is not before us. We need not address whether the 1988 calls were enough to trigger the running of an ordinary civil statute of limitations, because we conclude no statute of limitations bars an administrative claim for reclassification. We observe the 1988 incident did not result in an administrative hearing, nor in civil litigation.

A.

 "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614].) "The contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute." (*Claypool v. Wilson* (1992) 4 Cal.App.4th 646,

662 [6 Cal.Rptr.2d 77]; see *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1131-1133 [61 Cal.Rptr.2d 207].)

■ The PERS laws are to be interpreted in favor of the employee or beneficiary when a semantic ambiguity is presented by the statute at issue. (*City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1488 [280 Cal.Rptr. 847]. See, e.g., *Pearl v. Workers' Comp. Appeals Bd.* (2001) 26 Cal.4th 189 [109 Cal.Rptr.2d 308, 26 P.3d 1044] [construing PERL to preclude application of Labor Code limit on psychiatric disabilities for PERS safety members].) The PERS Board's interpretation and application of the statutes is to be given great weight. (*City of Sacramento v. Public Employees Retirement System, supra,* 229 Cal.App.3d at p. 1478; see *Coca-Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].) Although pension legislation is to be construed liberally, this rule "should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended." (*Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815, 822 [111 Cal.Rptr. 841] (*Neeley*).)

■ The Servicemen suggest the PERS Board decision is akin to a formal administrative interpretation and not merely the adjudication of this dispute. We disagree. (See *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 92-93 [130 Cal.Rptr. 321, 550 P.2d 593] [agency position "was not the equivalent of a regulation or ruling of general application but . . . was merely its litigating position in this particular matter"].) We also reject the City's efforts to invoke the Board's *staff* proposals as interpretive aids.

The PERS Board is governed by the California Constitution and statutes. The California Constitution formerly provided the PERS Board was to act with three, equal, criteria in mind: (1) providing member benefits; (2) minimizing employer contributions; and (3) defraying administrative costs. The California Constitution now provides in relevant part:

"Notwithstanding any other provisions of law or this Constitution to the contrary, the *retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration* of the system, subject to all of the following:

"(a) *The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will*

*assure prompt delivery of benefits and related services to the participants and their beneficiaries. . . .*

"(b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. *A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.*" (Cal. Const., art. XVI, § 17, italics added.)

The ballot pamphlet accompanying the italicized initiative language (Proposition 162) evidences a bitter dispute regarding "raids" on the PERS fund in an effort to shore up the state's ailing fisc. (Ballot Pamp., Gen. Elec. (Nov. 3, 1992) analysis of Legis. Analyst and arguments regarding Prop. 162, pp. 37-39; see *Board of Retirement v. Santa Barbara County Grand Jury* (1997) 58 Cal.App.4th 1185, 1193 [68 Cal.Rptr.2d 607]; *Board of Administration v. Wilson, supra,* 52 Cal.App.4th at pp. 1120-1121.)

The California Constitution gives the PERS Board "plenary authority" over the PERS system, which has expertise in making determinations about the classification of employees, among other subjects. PERS has a fiduciary duty to provide timely and *accurate* information to its members. (See *In re Application of Smith* (Mar. 31, 1999) PERS Prec. Dec. No. 99-01 ["The duty to inform and deal fairly with members also requires that the information conveyed be complete and unambiguous."]; see also *Boxx v. Board of Administration* (1981) 114 Cal.App.3d 79, 90 [170 Cal.Rptr. 538] [once local agency entered into PERS contract, it, too, had duty to properly classify employee] *(Boxx)*.)

Misclassification occurs for various reasons. Sometimes a single employee seeks reclassification. (E.g., *In re Application of Smith, supra,* PERS Prec. Dec. No. 99-01.) Employee groups regularly seek reclassification, and may succeed by PERS Board action or by legislation. A statute (§ 20890, formerly § 20803.2) provides that prior local miscellaneous service will be converted to local safety service if the employee works for the same agency, the prior miscellaneous position was reclassified as a safety position (whether by statute or by PERS ruling), and the employee has other safety position credit. (See *City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 792, fn. 5, 800 [27 Cal.Rptr.2d 545].) This reflects that reclassifications regularly occur. A reclassification means the individual members of the class must have their particular years of

service under a particular class adjusted. This means such members, or their employers, or both, are asked to make increased contributions to PERS to make up for the retirement contributions they should have been paying all along, in order to earn the more generous pension benefits. (See *Campbell v. Board of Administration* (1980) 103 Cal.App.3d 565 [163 Cal.Rptr. 198] [employees tried to avoid paying the higher contributions required by retroactive reclassification]; *County of Marin Assn. of Firefighters v. Marin County Employees Retirement Assn.* (1994) 30 Cal.App.4th 1638 [36 Cal.Rptr.2d 736] (*County of Marin*) [not a PERS case, but decided under similar law].)

## B.

A pair of statutes provides the PERS Board's power and obligation to fix mistakes.

Section 20160 (formerly § 20180) sets out the PERS Board's duties to correct different types of errors as follows:

"(a) Subject to subdivisions (c) and (d), the board may, in its discretion and upon any terms it deems just, correct the errors or omissions of any active or retired member, [if asked to do so no later than six months after discovery of the error]. [¶] . . . [¶]

"(b) Subject to subdivisions (c) and (d), the board shall correct all actions taken as a result of errors or omissions of the university, any contracting agency, any state agency or department, or this system.

"(c) The duty and power of the board to correct mistakes, as provided in this section, shall terminate upon the expiration of obligations of this system to the party seeking correction of the error or omission, as those obligations are defined by Section 20164.

"(d) The party seeking correction of an error or omission pursuant to this section has the burden of presenting documentation or other evidence to the board establishing the right to correction pursuant to subdivisions (a) and (b).

"(e) Corrections of errors or omissions pursuant to this section shall be such that the status, rights, and obligations of all parties described in subdivisions (a) and (b) are adjusted to be the same that they would have been if the act that would have been taken, but for the error or omission, was taken at the proper time. However, notwithstanding any of the other provisions of this section, corrections made pursuant to this section shall adjust

the status, rights, and obligations of all parties described in subdivisions (a) and (b) as of the time that the correction actually takes place if the board finds any of the following:

"(1) That the correction cannot be performed in a retroactive manner.

"(2) That even if the correction can be performed in a retroactive manner, the status, rights, and obligations of all of the parties described in subdivisions (a) and (b) cannot be adjusted to be the same that they would have been if the error or omission had not occurred.

"(3) That the purposes of this part will not be effectuated if the correction is performed in a retroactive manner."

Note that the statute just quoted expresses a preference for retroactive correction of errors. (§ 20160, subd. (e).)

Section 20164 (formerly § 20181) discusses time limits for making corrections, as follows:

"(a) The obligations of this system to its members continue throughout their respective memberships, and the obligations of this system to and in respect to retired members continue throughout the lives of the respective retired members, and thereafter until all obligations to their respective beneficiaries under optional settlements have been discharged. The obligations of the state and contracting agencies to this system in respect to members employed by them, respectively, continue throughout the memberships of the respective members, and the obligations of the state and contracting agencies to this system in respect to retired members formerly employed by them, respectively, continue until all of the obligations of this system in respect to those retired members, respectively, have been discharged. . . .

"(b) For the purposes of payments into or out of the retirement fund for adjustment of errors or omissions, whether pursuant to Section 20160, 20163 or 20532, or otherwise, the period of limitation of actions shall be three years, and shall be applied as follows:

"(1) In cases where this system makes an erroneous payment to a member or beneficiary, this system's right to collect shall expire three years from the date of payment.

"(2) In cases where this system owes money to a member or beneficiary, the period of limitations shall not apply.

"(3) In cases where payment is erroneous because of the death of the retired member or beneficiary or because of the remarriage of the beneficiary, the period of limitation shall commence with the discovery of the erroneous payment.

"(c) Notwithstanding subdivision (b), where any payment has been made as a result of fraudulent reports for compensation made, or caused to be made, by a member for his or her own benefit, the period of limitation shall be 10 years and that period shall commence either from the date of payment or upon discovery of the fraudulent reporting, whichever date is later.

"(d) The board shall determine the applicability of the period of limitations in any case, and its determination with respect to the running of any period of limitation shall be conclusive and binding for the purposes of correcting the error or omission."

We note the last part of this statute (§ 20164, subd. (d)) provides that the PERS Board's determination of which period of limitation applies, and regarding "the running of any period of limitation *shall be conclusive and binding for purposes of correcting the error or omission.*" (Italics added.) However, the Board does not contend the "conclusive and binding" determination precludes all judicial review. (See *Board of Retirement v. Santa Barbara County Grand Jury, supra,* 58 Cal.App.4th at p. 1193 ["Proposition 162 removed the Legislature's authority to meddle in the Board's investment decisions and it established that the Board's primary obligation was to its members and beneficiaries. [Citation.] Proposition 162 did not insulate pension boards from judicial oversight."]; *Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180 [49 Cal.Rptr.2d 220].)

In the *County of Mono* case, a group of local employees wanted to be reclassified as local safety members, as provided by Mono County's contract with PERS. After concluding the employees met the applicable definition and were entitled to the enhanced benefits provided to local safety members, we held the mistake statute applied to reclassification proceedings (although this did not bar reclassification on the facts). We pointed out PERS had not passed on the statute of limitation question in that case, unlike in this case. (*County of Mono, supra,* 69 Cal.App.4th at p. 1116, fn. 4.) We first stated "This is not a case . . . where PERS owes money to a member or beneficiary, at least at this juncture" and therefore the prior section which is now section 20164, subdivision (b)(2) did not apply: "Instead, this is a case where PERS seeks to reclassify [employees] as safety members and to retroactively assess Mono and the [employees] the difference in contributions between

miscellaneous and safety membership." (*County of Mono, supra*, 69 Cal.App.4th at p. 1117.) We then ruled: "Since PERL does not set forth a specific statute of limitations that applies here, PERS's claim for reclassification and retroactive contributions is governed by the general statute of limitation provisions set forth in the Code of Civil Procedure." (*Ibid.*)

*County of Mono, supra,* 69 Cal.App.4th 1105 did not address Proposition 162, and although it quoted the precursor to section 20160, regarding the preference for retroactive corrections, it did not discuss that provision in the portion concluding the mistake statute applied. Nor did it address whether a reclassification proceeding is a civil action, a critical omission. As we shall explain, we reject the view that the mistake statute applies to PERS administrative reclassification proceedings.

In the administrative proceeding herein (conducted before *County of Mono* was decided) the City argued the three-year statute limited the Servicemen's potential recovery to a three-year period, but on appeal the City contends the statute of limitations cuts off *any* recovery. (See *County of Mono, supra,* 69 Cal.App.4th at p. 1119 ["Mono is mixing the 'apple' of statute of limitations . . . with the 'orange' of retroactive relief."].) The parties quarrel about the City's ability to invoke *County of Mono,* but for the purposes of this appeal we assume it can do so, even though the PERS Board did not have the benefit of that decision in making its ruling.

Although "reclassification" is not mentioned in these sections, a misclassification qualifies as an error within the statute providing "the board shall correct all actions taken as a result of errors or omissions of . . . any contracting agency . . . or this system." (§ 20160, subd. (b).) Such an error ordinarily should be corrected retroactively, "such that the status, rights, and obligations of all parties . . . are adjusted to be the same that they would have been if the act that would have been taken, but for the error or omission, was taken at the proper time." (§ 20160, subd. (e).) The PERS Board's (*and the City's*) obligations to PERS members lasts throughout their memberships or their lifetimes if they have retired. (§ 20164, subd. (a).) The California Constitution charges that the "board's duty to its participants . . . shall take precedence over any other duty." (Cal. Const., art. XVI, § 17, subd. (b).)

There is no requirement that a particular type of claim have a statute of limitation. In the Code of Civil Procedure, the Legislature has "specified the limitations applicable to a wide variety of actions, and then to rebut the possible inference that actions not therein specifically described are to be

regarded as exempt from limitations, it has specified a four-year limitation upon 'an action for relief not hereinbefore provided for' (sec. 343); and where it has intended that an action shall be exempt from limitations, it has said so in clear and unmistakable language." (*Bogart v. George K. Porter Co.* (1924) 193 Cal. 197, 201 [223 P. 959, 31 A.L.R. 1045].) The Legislature has provided, for example, that there is no period of limitations in actions to recover money deposited in a bank. (Code Civ. Proc., § 348.) Such money belongs to the depositor, rand the Legislature could rationally conclude it should be recoverable regardless of the passage of time.

The PERS Board considered and rejected the City's statute of limitation claims, as follows: "The City further argues that this action is subject to a three-year statute of limitation because it essentially seeks to enforce a statutory duty and/or to obtain relief on ground of mistake. [¶] The statute of limitations contained in Government Code section 20164(b) applies to erroneous payments into or out of the retirement fund, not to reclassifications. The three year statute of limitations in the Code of Civil Procedure is also inapplicable. Government Code section 20164(a) provides that CalPERS' obligations to its members 'continue throughout their respective memberships' and its obligations to retired members continue throughout the lives of the retired members, and thereafter until all obligations to their respective beneficiaries, if any, have been discharged. To the extent that the two statutes conflict, the more specific language in the retirement statute should govern. CalPERS also notes that section 20164 is a substantive statute creating an <u>ongoing</u> duty to properly discharge its obligations. The procedural statute of limitations does not appear to override this duty." (Fn. omitted.)

Given that the People, in the exercise of their reserved initiative powers vested *plenary* authority in the PERS Board in order to prevent state officials from using retirement funds improperly, and given that the Legislature has vested the PERS Board with the explicit power to resolve statute of limitations questions, we believe the courts must defer to the PERS Board in such cases, absent some showing of an arbitrary, irrational, exercise of such power. As indicated above, misclassification was not the impetus for Proposition 162. But the People nonetheless expressed the adamant view that the PERS Board, in matters falling within its purview, was to have a relatively unfettered hand to employ its institutional expertise, primarily *on behalf of members*. (Cal. Const., art. XVI, § 17, subd. (b).)

The PERS Board's determination that reclassification was not subject to any statute of limitations because of its ongoing duty to its members is not

arbitrary or irrational. The PERS Board's decision advances the policy immanent in the California Constitution, to ensure the rights of members and retirees to their full, earned, benefits. This is not a case where a retroactive reclassification would grant the Servicemen more than what the statutes allow, if they meet the statutory definition of local firefighter (which we later conclude they do). (Cf. *Hudson v. Posey* (1967) 255 Cal.App.2d 89, 91-92 [62 Cal.Rptr. 803] [public retirement benefits "are wholly statutory"]; *In re Henderson* (Nov. 18, 1998) PERS Prec. Dec. No. 98-02 [although retiree detrimentally relied on PERS mistake in benefits amount, "To find an estoppel here would be to allow CalPERS to unilaterally alter the statutory retirement benefit formula without benefit of enabling statutory authorization"].)

The Legislature has expressed a preference for retroactive corrections. Section 20160, quoted above, provides the PERS Board "shall correct all actions taken as a result of errors or omissions of . . . any contracting agency, or this system." (*Id.*, subd. (b); see *Rodie v. Board of Administration* (1981) 115 Cal.App.3d 559, 566 [171 Cal.Rptr. 433] [interpreting former § 20180 broadly].) A misclassification is covered by this section. Section 20160 goes on to provide "Corrections . . . shall be such that the status, rights, and obligations . . . are adjusted to be the same that they would have been if the act that would have been taken, but for the error or omission, was taken at the proper time," *unless* the PERS Board finds retroactive correction cannot be made, not all parties can be adjusted retroactively, or "the purposes of this part will not be effectuated" by retroactive correction. (*Id.*, subd. (e).) The preference for retroactive corrections dovetails with our discussion above.

*Boxx*, *supra*, 114 Cal.App.3d 79, addressed a similar problem consistent with our analysis. After concluding Boxx should have been classified as a safety member, the court required the PERS-employer contract *to be amended* to cover Boxx, relying on former section 20180, now section 20160. (*Boxx*, *supra*, 114 Cal.App.3d at pp. 88-92.) "While there was no obligation to enter into the contract with PERS, once [the contracting agency] did, and once it included Boxx as a member in PERS, it became part of respondent's employment contract. [Citation.] Inherent in this contract is the duty on [the contracting agency]'s part and PERS' part to properly classify respondent. As in *Crumpler* [*v. Board of Administration* (1973) 32 Cal.App.3d 567, 582 [108 Cal.Rptr. 293]] [the contracting agency] was estopped from not correcting its contract with PERS, if a correction was necessary. Concomitantly with the estoppel applicable to [the contracting agency], PERS likewise is estopped to deny coverage. As *Crumpler* states:

'The relationship between the city and the board is such that estoppel of the city is binding on the board. An estoppel binds not only the immediate parties to the transaction but those in privity with them.' (*Id.* at p. 582.) [¶] Hence, under section 20180, the 'action required' was to properly classify respondent so that the duties he performed would be covered under PERS to give him its maximum coverage. This accomplishes the purpose of contracting with PERS." (*Id.* at p. 90.)

The City argues the retroactive-correction preference set out in section 20160, which allows prospective corrections in certain cases, "evinces the legislative recognition that notwithstanding the lifelong obligations that CalPERS has to member employees and beneficiaries, there will be circumstances when retroactive adjustment is simply not warranted at all. This section authorizes courts to conclude, as did this Court in *County of Mono, supra,* 69 Cal.App.4th 1105, that CalPERS' lifelong obligations to its members must and do give way in cases such as this one, when a retroactive correction cannot be made due the bar of the statute of limitations, or when CalPERS fails to promptly correct classification errors."

The first sentence of the City's argument is correct. The second sentence reflects a number of mistakes. First, section 20160, subdivision (e), confers on *PERS*, not on courts, the duty to determine when corrections should be prospective. Second, our opinion in *County of Mono, supra,* 69 Cal.App.4th 1105 did not discuss section 20160 in the manner the City portrays. Finally, the City is not trying to limit the Servicemen to prospective relief (indeed, the Serviceman position no longer exists); it is trying to preclude them from receiving *any* relief.

We reject the City's view (accepted by *County of Mono*) that because classification mistakes are not specifically mentioned in the PERS statutes pertaining to mistakes, courts should import the general "mistake" statute of limitations of the Code of Civil Procedure. The trial court mentioned a couple of cases which reject application of the Code of Civil Procedure statutes of limitations in administrative proceedings. (*Robert F. Kennedy Medical Center v. Department of Health Services* (1998) 61 Cal.App.4th 1357, 1361-1362 [72 Cal.Rptr.2d 180] [recovery of overpayments made to a Medi-Cal provider by offsets not controlled by civil statute of limitations]; *Little Company of Mary Hospital v. Belshé* (1997) 53 Cal.App.4th 325, 329 [61 Cal.Rptr.2d 626] ["Statutes of limitations found in the Code of Civil Procedure . . . do not apply to administrative actions."].) In an earlier case, *Bernd v. Eu* (1979) 100 Cal.App.3d 511 [161 Cal.Rptr. 58], we concluded an administrative *disciplinary* proceeding was not subject to the Code of Civil

Procedure statutes of limitation. We did not discuss these authorities in *County of Mono*. We do now.

"An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (Code Civ. Proc., § 22.) "The word 'action' as used in this Title [re: statutes of limitation] is to be construed, whenever it is necessary so to do, as including a special proceeding of a civil nature." (*Id.*, § 363.) An administrative proceeding is neither a "civil action" (*id.*, §§ 22, 312) nor a "special proceeding of a civil nature" (*id.*, §§ 23, 363), "to the commencement of which the statute of limitations relates. Such provision . . . relates only to actions or special proceedings in courts, and not hearings before boards. [Citations.] Respondent board is not a 'court' [citation], even though it exercises a power judicial in its nature." (*Bold v. Board of Medical Examiners* (1933) 133 Cal.App. 23, 25 [23 P.2d 826].) Although the *Bold* case (like *Bernd v. Eu, supra,* 100 Cal.App.3d 511) also involved disciplinary actions, we see no reason why an administrative proceeding which does not involve discipline is any more akin to a "civil action" or "special proceeding of a civil nature." (See *French v. Construction Laborers Pension Trust* (1975) 44 Cal.App.3d 479, 485 [118 Cal.Rptr. 731] [the "right to rescind by notice without judicial proceedings is not barred by the statute of limitations. Statutes of limitation act as a bar to actions or proceedings in courts"].)

Bernard Witkin's treatise states flatly: "The general and special statutes of limitation referring to actions and special proceedings are applicable only to judicial proceedings; they do not apply to administrative proceedings. [Citations.] Limitation periods are, however, provided for in the acts governing some administrative proceedings." (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 405(2), p. 510; see Cal. Administrative Hearing Practice (Cont.Ed.Bar 2d ed. 1997) Initiating Adjudicative Action, § 3.33, pp. 138-139.) The rule is not limited to disciplinary cases. (See, e.g., *Cuadra v. Millan* (1998) 17 Cal.4th 855, 870 [72 Cal.Rptr.2d 687, 952 P.2d 704] [wage claim]; *Triad Data Services, Inc. v. Jackson* (1984) 153 Cal.App.3d Supp. 1, 12-13 [200 Cal.Rptr. 418].)

In its brief the City appears to agree with this view: "Contrary to Local 790's contention, moreover, the City does not claim that the statute of limitations barred *the administrative proceedings*. The City simply contends that CCP section 338(d) bars *the remedy* that necessarily flowed from the administrative reclassification decision—the recovery of 'public moneys'

from the City in the form of retroactive contributions." (Original italics.) The City does not explain the purpose of an administrative proceeding which cannot result in any relief. If the applicant proves a mistake was made (§ 20160, subd. (d)), the PERS Board "shall" correct the mistake (*id.*, subd. (b), and do so retroactively in most cases (*id.*, subd. (e)).

The City urges *People v. Union Oil Co.* (1957) 48 Cal.2d 476 [310 P.2d 409] (*Union Oil*) "held that a claim for recovery of public moneys paid out through mistake is a civil claim which is subject to CCP section 338(d)." That case held (at p. 482) that a civil action to recover overpayments of public funds was subject to the mistake statute (formerly numbered Code Civ. Proc., § 338, subd. 4). Section 20163 (formerly § 20165) enables PERS to "adjust" future contributions by the City in order to correct mistaken payments caused by the misclassification. This is one mechanism enabling PERS to correct the mistake. But neither this enforcement mechanism nor the administrative hearing resulting in reclassification is a civil action, as was at issue in the *Union Oil* case. *Union Oil* was cited by *County of Marin*, *supra*, 30 Cal.App.4th at pages 1651-1653, in support of extension of the mistake statute to cover claims for arrearages resulting from reclassifications under a county retirement law. *County of Marin* was discussing a claim made in a civil action. That part of *County of Marin*, in turn, was cited in *County of Mono*, for the proposition that the mistake statute could bar the reclassification proceeding itself. (*County of Mono, supra*, 69 Cal.App.4th at pp. 1118-1119.) We respectfully decline to join in this apparent misapplication of *Union Oil* and *County of Marin*. We decline to express any opinion about the application of the mistake statute, or any other statute of limitation, to a theoretical future civil action by PERS to seek arrearages or otherwise judicially enforce the consequences of its reclassification decision. The ALJ's decision, which was adopted by the PERS Board, did not require anyone to pay any money; it merely reclassified the employees. That issue is not properly before this court. Nor do we express any view on the scope or soundness of the decision in *County of Marin*, which, as stated earlier, was not a PERS case but arose under a different statutory scheme.

Moreover, PERS maintains that its remedy in no event would be a suit for public moneys paid out through mistake. Instead, because contribution rates are set by law (§ 20814) and because no contracting agency "shall fail or refuse to pay the employers' contribution required by this chapter" (§ 20831), PERS argues its remedy is writ of mandate to compel the performance of the statutory duty to pay the actuarially determined contributions rates. We express no view on the validity or timeliness of possible future legal actions PERS might take to implement the reclassification decision.

The Legislature has prescribed time limitations in some administrative cases. For example, a statute gives the Labor Commissioner the ability to establish time limitations: "The salutary purposes of such limitations [citations] are no less applicable to [administrative] proceedings for unpaid wages than they are to civil actions for the same relief." (*Cuadra v. Millan, supra*, 17 Cal.4th at p. 867.)

As relevant to the PERS Board, the Legislature has prescribed a six-month period in which the Board may correct "errors or omissions of any active or retired member[.]" (§ 20160, subd. (a).) *For all other errors*, the PERS Board's duty to correct the mistake (upon proof of the right to correction by the applicant) does not terminate until "the expiration of obligations of this system to the party seeking correction of the error or omission," which generally means throughout PERS membership and through the lifetime of retired PERS members. (§§ 20160, subd. (c), 20164, subd. (a).) As stated above, such corrections should ordinarily be made retroactive. (§ 20160, subd. (e).)

We agree with PERS's position, echoed by the Servicemen, that this scheme evidences a legislative purpose of "correcting system errors or omissions wherever possible, and City's position would preclude implementing such intention." Because a misclassification is a mistake not caused by the members, the PERS Board's duty to correct it continues throughout their membership and the lifetime of retired members. By specifying that the PERS Board "shall correct all actions taken as a result of errors or omissions of . . . any contracting agency . . . or this system" (§ 20160, subd. (b)) and providing such corrections should ordinarily be retroactive, the Legislature has made it abundantly clear that there is no limitation period applicable to the administrative reclassification proceeding. Had the Legislature wanted to carve out classification mistakes from the general rule governing other mistakes by PERS and contracting agencies, it could easily have done so. We should not supply a limitation period not contemplated by the Legislature. (See *Mt. San Antonio Community College Dist. v. Public Employment Relations Bd.* (1989) 210 Cal.App.3d 178, 188 [258 Cal.Rptr. 302] ["a statute of limitations may not be created by judicial fiat"].)

The Legislature has also set forth limitations regarding *civil actions* pertaining to matters within the PERS Board's purview. Actions to adjust mistakes resulting in "payments into or out of the retirement fund" are normally barred after three years, as with the general mistake statute. (§ 20164, subd. (b).) However, even this limitation does not apply "where this system owes money to a member or beneficiary[.]" (*Id.*, subd. (b)(2).)

Actions to recoup money paid by the fraud of a member are generally barred after 10 years. (*Id.*, subd. (c).) These limitation periods for "actions" do not apply to administrative proceedings, for the reasons already explained. But they do demonstrate the Legislature knows how to draft time limits applicable to specific types of cases when it wants to. Again, we express no view on the timeliness of possible future civil actions by PERS, as such issue is not presented by this appeal.

We make two caveats.

First, there are time limitations applicable to filing a petition for writ of mandate *to overturn* an administrative decision. (See Cal. Administrative Mandamus (Cont.Ed.Bar 2d ed. 1989) Statutes of Limitations, ch. 7, pp. 239-252.) For example, a mandamus proceeding seeking proper classification of a teacher, pursuant to a statutory classification, is barred if brought beyond three years, the period in which to bring *civil actions* (including a mandamus action) for liability based on statutes. (Code Civ. Proc., § 338, subd. (a); *Peralta Federation of Teachers v. Peralta Community College Dist.* (1979) 24 Cal.3d 369, 386 [155 Cal.Rptr. 679, 595 P.2d 113]; *Ingram v. Board of Education* (1940) 36 Cal.App.2d 737, 738-739 [98 P.2d 527].) Those limitations are not germane here.

■■■ Second, in some cases of delay, equity may bar an administrative proceeding, and "the courts will apply notions of laches borrowed from the civil law." (*Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151, 1158-1159 [213 Cal.Rptr. 53].) "In civil actions the 'defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' " (*Id.* at p. 1159.) In some cases equity will "borrow" a closely analogous civil statute of limitations to apply in an administrative proceeding. Where equity "borrows" a statute of limitations, it is to avoid unfairness due to delay "by the public agency against whom laches was asserted." (*Id.* at p. 1160, italics omitted; but see *Fahmy v. Medical Bd. of California* (1995) 38 Cal.App.4th 810, 817, fn. 5 [45 Cal.Rptr.2d 486] ["in the 10 years since *Brown* was decided, the section of the opinion applying a statute of limitations to a laches defense in an administrative setting has never been followed, except by the same court"].)

■■■ The City does not head any argument based on laches on appeal, although laches is mentioned cursorily in one paragraph that does not explain how the City has been prejudiced. ■■■ The failure to head an argument results in a waiver. (Cal. Rules of Court, rule 15(a); *Opdyk v.*

*California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [41 Cal.Rptr.2d 263]; *Landa* v. *Steinberg* (1932) 126 Cal.App. 324, 325 [14 P.2d 532].) The failure to provide an explicit prejudice analysis also results in a waiver. (*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 601 [191 P.2d 432]; *Paterno* v. *State of California* (1999) 74 Cal.App.4th 68, 105-106 [87 Cal.Rptr.2d 754].) ▮ Elsewhere in its brief the City does claim the Servicemen and union were dilatory, as follows:

"In this case, CalPERS seeks retroactive contributions from the City for approximately 55 Airport Servicemen for a 22-year period—from 1976 to 1998. CalPERS has yet to make a precise cost estimate, because it 'may still conduct an individual review' to ensure that each Airport Serviceman qualifies for local safety status. CalPERS informally estimates that the cost to the City could be over $4 million. The cost to any public employer for reclassifications involving numerous employees would be equally catastrophic and unfair.

"In summary, the equities in this case all point in favor of the City and the trial court's decision. CalPERS simply failed to investigate the information that it discovered in 1988. The Airport Servicemen and Local 790 sat on their rights and duties for over seven years before filing a reclassification petition. Appellants' inaction caused an enormous unfunded liability, yet they demand that the City pay for their delay. This Court's decision in *County of Mono*, however, protects public agencies from this unfair and irresponsible result." (Citations omitted.)

The City did not argue laches before the PERS Board or the trial court. ▮ A party may not ordinarily raise a new theory on appeal. (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].) We are not obliged to consider an issue not properly briefed on appeal (*People* v. *Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186]; *Diamond Springs Lime Co.* v. *American River Constructors* (1971) 16 Cal.App.3d 581, 608 [94 Cal.Rptr. 200]), nor factual issues not litigated in the trial court (see *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184]), nor issues not timely raised in an administrative proceeding (*Harris Transportation Co.* v. *Air Resources Board* (1995) 32 Cal.App.4th 1472, 1480 [38 Cal.Rptr.2d 431]; see *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 680-681 [170 Cal.Rptr. 484, 620 P.2d 1032]). ▮ Laches in almost all cases raises factual issues regarding the cause of an asserted delay and the prejudice, vel non, therefrom. (See *Brown* v. *State Personnel Bd.*, *supra*, 166 Cal.App.3d at p. 1159; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 15, p. 692.) No such factual

issue has been properly presented in this case, as just explained. The Servicemen have had no opportunity to refute the City's belated and unsupported claims of prejudice before the trier of fact. Therefore laches does not provide an independent basis for sustaining the judgment on appeal. (Cf. *Fountain Valley Regional Hospital & Medical Center v. Bonta'* (1999) 75 Cal.App.4th 316, 323-325 [89 Cal.Rptr.2d 139] [where statute of limitation is "borrowed" in an administrative proceeding, prejudice may be presumed, requiring other side to rebut presumption on facts].)

Moreover, although in extraordinary cases laches need not be pleaded (*Southern Counties Gas Co. v. Eden* (1931) 118 Cal.App. 582, 587-588 [5 P.2d 654]; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 1051, p. 501), such cases arise when the evidence reveals the elements of laches without dispute. (E.g., *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1158-1159 [98 Cal.Rptr.2d 775].) That is not this case for at least two reasons. First, as stated, the facts about the degree of prejudice were not litigated below. (*Green v. Board of Dental Examiners* (1996) 47 Cal.App.4th 786, 792-795 [55 Cal.Rptr.2d 140].) Second, as stated, the City has not properly invoked laches on appeal. Although the City does rely on the *County of Mono* case, which "borrowed" the mistake statute of limitations for use in administrative reclassification proceedings, *County of Mono* was not based on laches and did not discuss that doctrine. (See *County of Mono, supra,* 69 Cal.App.4th at pp. 1117-1118.)

We conclude it is inappropriate to import the mistake statute of limitations into an administrative reclassification proceeding. We decline to follow our prior decision in *County of Mono,* to the extent it is inconsistent with these views.

The City blames PERS for delaying correcting the mistake, causing an unfunded liability for the City. "The great inequity . . . is that unsuspecting employers have to foot the bill for mistakes that CalPERS makes." But it is *the City,* too, which misunderstood that the Servicemen should have been treated as firefighters from the beginning, and thereby underfunded their retirement for years. (See § 21064, subd. (a) ["obligations of . . . contracting agencies to this system in respect to members . . . continue throughout the memberships . . . and the obligations of . . . contracting agencies to this system in respect to retired members formerly employed by them . . . continue until all of the obligations of this system in respect to those retired members . . . have been discharged."]; *Boxx, supra,* 114 Cal.App.3d at p. 90 ["Inherent in this contract is the duty on [the local agency's] part and PERS' part to properly classify respondent."].) The City repeatedly blames PERS

for not fully investigating the classification issue in 1988, and asserts application of a statute of limitations will encourage PERS to be more diligent in the future. Why is it more equitable that the aggrieved workers should pay the price for the alleged delay by PERS? The City, which had an equal duty to correctly classify employees, and which fought (and continues to fight) reclassification, is in a poor position to blame PERS for not discovering and attempting to correct the mistake sooner.

The ballot pamphlet accompanying Proposition 162 warned "The requirement that pension system boards give highest priority to providing benefits to members and their beneficiaries could result in higher costs to employers." (Ballot Pamp., Gen. Elect., *supra,* analysis of Prop. 162 by Legislative Analyst, p. 37.) This weakens the City's claim that retroactive reclassification *unfairly* harms local agencies by causing unexpected liabilities. Instead it reflects a policy in favor of paying employees what they earned. That is not inherently unfair. (*Johnson v. Smith* (1954) 128 Cal.App.2d Supp. 859, 863 [275 P.2d 161] ["We are not unmindful of the ancient adage that the laborer is worthy of his hire."].)

The California Supreme Court touched on a similar issue in *Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 759-760 [55 Cal.Rptr.2d 107, 919 P.2d 721], involving Medi-Cal overpayment reimbursement procedures: "Plaintiff acknowledges that, because the final reimbursement settlement generally will give rise to a *provider's liability for repayment* of Medi-Cal moneys, the Department's delay in reaching a final reimbursement settlement does not result in the withholding of moneys from the provider. Instead, the provider generally will reap the benefit of the interest-free use of government funds to which the provider is not entitled. Plaintiff maintains a provider nevertheless is prejudiced financially by the delay, because the uncertainty as to large contingent claims hampers financial planning necessary for successful business operations. That circumstance is a matter properly to be remedied by the Legislature, however, and not by judicial fiat, in the absence of a time requirement established by the Legislature governing the Department's final reimbursement determination." Reclassification which downgrades a group of employees appears to be rare. (See *Crumpler v. Board of Administration, supra,* 32 Cal.App.3d 567, 582-586 [downgrade prospective only].) As with Medi-Cal audits, reclassifications generally result in increased liability on the part of the employer, who presumably had the use of money that should have been funding the correct retirement benefits all along. While the reclassification decision here will apparently result in an unanticipated financial liability on the City's part, the City has had the use of money it should have been expending towards the

retirement system, and we see nothing in the applicable legislation which cuts off the City's liability therefor.

We are not blind to the practical effect of the PERS decision to retroactively reclassify at least some of the Servicemen, perhaps as far back as 1976. Although exactly which Servicemen will qualify for safety status (and over what periods of time) has yet to be determined and the financial implications have therefore not been calculated, the parties agree the decision will in time require the City to spend money it does not want to spend and did not anticipate having to spend. The City earnestly did not consider the Servicemen equivalent to firefighters, which was a reasonable position, especially given the passage of time, albeit a mistaken position. Yet, by entering into a contract with the PERS system, and extending that contract to include safety members, the City bound itself to follow the applicable statutory definitions governing firefighters, and bound itself to abide by the lawful decisions of the PERS Board, including decisions to correct mistakes in classification of members. The PERS decision is not a windfall for the Servicemen, who stood ready to defend against some of the most horrible types of tragedies. It instead anticipates a day of fair reckoning for the City and its safety employees.

## II. *The Cross-appeal*

 The City contends the Servicemen "1) never were employees of a fire department; and 2) never had principal duties that 'clearly fall within the scope of active firefighting.' (Gov. Code, § 20433.)" We disagree with both claims.

### A.

As relevant here, " 'Local firefighter' means any officer or employee of a fire department of a contracting agency, except one whose principal duties are" discussed later. (§ 20433.)

The City's position is as follows: It maintains a fire department called the Oakland Fire Department. The Servicemen are employed by the Port of Oakland. Therefore, they are not employees "of a fire department of" the City. This argument assumes the Legislature intended the label given by a local government to its subdivisions would control. We disagree. "In our view, if it looks like a duck, walks like a duck, and sounds like a duck, it is a duck." (*People ex rel. Lockyer v. Pacific Gaming Technologies* (2000) 82 Cal.App.4th 699, 701 [98 Cal.Rptr.2d 400]; see *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1256 [241 Cal.Rptr. 22, 743 P.2d 1279].)

The Legislature did not say an employee had to work for something *called* a "fire department," only that he or she be employed by "a fire department." We agree with the PERS Board that "The use of the indefinite article 'a' suggests that the legislature had no intention of limiting the term fire department to a single fire department where a contracting agency maintains more than one fire department."

If an entity is designed to act and does act like a fire department, it is a de facto fire department. (See *Boxx, supra*, 114 Cal.App.3d at pp. 84-85 ["police departments could exist and law enforcement powers be exercised by organizations not named in [a peace officer] section"; "labeling the individuals as members of a police department is not as important as whether they are engaged in active law enforcement"], discussed in *County of Santa Clara v. Deputy Sheriff's Assn.* (1992) 3 Cal.4th 873, 885 [13 Cal.Rptr.2d 53, 838 P.2d 781].) This accords with the rule that a worker's status should be determined based on duties actually performed. (*Neeley, supra*, 36 Cal.App.3d at p. 818, fn. 2.)

The PERS Board found as follows: "Inquiry correctly focuses upon whether a firefighting unit was maintained by the contracting agency and whether or not it was engaged in active firefighting. The Port of Oakland has maintained a separate ARFF [Aircraft Rescue and Firefighting] unit at the airport. The airport has issued Airport Servicemen cards identifying them as 'firefighters,' emblazoned crash/fire/rescue vehicles with 'Oakland Airport Fire' or 'Oakland Airport Fire-Rescue' and have through numerous documents been represented or referred to as 'a' or 'the' fire department for Oakland International Airport. While such names are not determinative of whether they engaged in active firefighting, they are relevant to the determination of whether a separate and identifiable ARFF unit was maintained by the Port of Oakland. That is clearly the case here. Oakland Airport Servicemen were part of a separate ARFF unit or 'fire department.' " We agree with the Board.

This undermines the City's point that the Servicemen did not qualify for employment with the Oakland Fire Department. They did not have to.

The City contends the *Boxx* decision and the de facto department theory have been undermined by *Feliciano v. Board of Administration* (1992) 1 Cal.App.4th 143 [1 Cal.Rptr.2d 576]. The passage relied on by the City does not change anything. The issue was the term "safety officer," which was designed to cover contracting agencies which have a combined peace officer and firefighter department. The new term was added to the retirement laws

to explicitly cover employees of those combined departments. *Feliciano* quoted a letter to the Governor, as follows: " 'Current retirement law defines policeman and fireman in terms of employment with a police or fire department. However, some cities have a public safety department where an individual serves as both policeman and fireman. Thus, the current definitions are technically deficient.' " (*Id.* at p. 146, italics omitted.) Apart from the impropriety of using a letter to the Governor to construe a bill (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873]), this passage does not help the City. It refers to the problem as a technicality. More importantly, the case had nothing to do with the de facto department issue. ■ Cases are not authority for propositions not considered. (*Hart v. Burnett* (1860) 15 Cal. 530, 598.)

■ We also observe that the Board has previously applied the de facto doctrine in an unpublished decision involving the City's park rangers. The City correctly observes this decision was not designated as a precedential decision and argues such unpublished decision is entitled to no weight. ■ However, the California Supreme Court has recently concluded that an administrative decision, even if not designated as a precedential decision, properly informs as an administrative interpretation. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 53, fn. 4 [109 Cal.Rptr.2d 14, 26 P.3d 343] ["the rules of court do not bar our citation of such unpublished decisions to demonstrate administrative construction"].)

■ The statutes creating and authorizing PERS (of which § 20433 is a part) do not define the term "fire department." This is in marked distinction to the provisions of the Government Code establishing the classic Police Officers' Pension Fund and Firemen's Pension Fund (§ 50800 et seq.), which in its present form was enacted in 1949. That act generally mandates contributions to a Police Relief Pension Fund and a Firemen's Relief Pension Fund where a local agency has created such funds. (See §§ 50802, 50804, & 50805.)

That pension fund, for police officers and firemen, is created by title 5 (Local Agencies); division 1 (Cities and Counties) part 1 (Powers and Duties Common to Cities and Counties) chapter 4 (Police Officers' Pension Fund and Firemen's Pension Fund) of the Government Code. Section 50800 provides, "Unless the context otherwise requires, the definitions and general provisions set forth in this article govern the construction *of this chapter.*" (Italics added.) Section 50805 provides, " 'Member' also means any person duly appointed or selected and sworn as a member of *the regularly constituted fire department* if the local agency has established a firemen's relief

and pension fund pursuant to this chapter." (Italics added.) Section 50803 provides, " 'Department' means *regularly constituted fire department* or regularly constituted police department." (Italics added.)

■ Where a statute, with reference to one subject, contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 26 [10 Cal.Rptr.2d 183, 832 P.2d 899].) ■ Since the Firemen's Pension Fund contains a definitional section requiring a fire department to be "regularly constituted," and since no comparable definition exists under the statutes defining PERS, we may draw the inference that when section 20433 refers to "a fire department" the fire department need not be "regularly constituted," as is the case under the Firemen's Pension Fund. Put differently, the provisions of the Firemen's Pension Fund indicate that, if the Legislature wishes to limit retirement benefits to a regularly constituted fire department, it knows how to do it.

Finally, in some PERS statutes the Legislature conditions extension of enhanced "safety" status on an explicit election by a local agency. (See *City of Sacramento v. Public Employees' Retirement System, supra,* 22 Cal.App.4th at p. 790 ["The amendment did not condition its application upon the election of the contracting agency nor had the section ever been so conditioned. By contrast, another section, added in the same enactment, does condition the extension of safety membership to harbor and port officers upon the election of the contracting agency."]; *Schaeffer v. Public Employees' Retirement System* (1988) 202 Cal.App.3d 609, 613-615 [248 Cal.Rptr. 647].) If the Legislature wanted to limit the ambit of "firefighter" to cases where a local agency explicitly wanted to extend enhanced benefits, it could easily have done so by inserting such limitation in the statute.

B.

The City contends the Servicemen cannot be firefighters because their principal duties were not fighting fires. Once the fact of what duties are performed is determined, whether those duties satisfy the statute is a legal question. (*Neeley, supra,* 36 Cal.App.3d at p. 819; *Crumpler v. Board of Administration, supra,* 32 Cal.App.3d at p. 576.)

The statute makes all members of a fire department firefighters "except one whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise and whose functions do not clearly fall within the scope of active firefighting . . . ." (§ 20433.) The

City does not explain how a Serviceman's duties fall within the named class or like occupations. The canon *ejusdem generis* applies here. We explained as much in a case construing a similar statute, Labor Code 4850, which excluded coverage for "employees of a county sheriff's office whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise, and whose functions do not clearly come within the scope of active law enforcement service. . . ." We said: "The County contends bailiffs fall under 'or otherwise' because their 'functions do not clearly come within the scope of active law enforcement service.' The term 'or otherwise' is a relative term. 'When so used as a general phrase following the enumeration of particular things, such words are usually interpreted in a restricted sense as referring to things or matters of the same kind [*ejusdem generis*] as those specifically enumerated.' [Citation.] [¶] The question, then, is whether a bailiff . . . is in the same class as support personnel of the sheriff's office performing more routine tasks, such as telephone operators, clerks, stenographers, machinists, and mechanics. We find it is not." (*Biggers v. Workers' Comp. Appeals Bd.* (1999) 69 Cal.App.4th 431, 440 [81 Cal.Rptr.2d 628].) The City does not explain how a Serviceman falls within the general category of "telephone operator, clerk, stenographer, machinist, mechanic, or otherwise" as provided by section 20433.

In any event, the City's theory is that "principal" "means frequent duties, not important duties." We disagree.

The primary dictionary definition of "principal" is "First or highest in rank or importance; that is at the head of all the rest; of the greatest account or value; foremost[.]" (8 Oxford English Dict. (1933) p. 1373, col. (2); see Webster's 3d New Internat. Dict. (1971) p. 1802, col. (3).)

We construed the phrase "principal profession" in a ballot-designation statute to mean "the activity is one of the primary, main or leading professional . . . endeavors of the candidate. Consequently, involvement which is only nominal, pro forma, or titular in character does not meet the requirements of the statute." (*Andal v. Miller* (1994) 28 Cal.App.4th 358, 366 [34 Cal.Rptr.2d 88].)

The PERS Board found and the City does not contest, that the Servicemen were prepared to respond to serious aircraft and airport fire emergencies, as required by federal aviation laws. Because, fortunately, airport disasters are rare (the City states the Servicemen responded to three aircraft fires "in over 10 years"), the Servicemen had other subordinate duties to perform, instead of just sitting around waiting for a fire.

A few excerpts from the PERS Board decision illustrate the duties of the Servicemen:

"13. Airport Servicemen have 'first response' capability for emergency medical technician (EMT) calls, both for customers and employees at the airport. In 1996, over 9.7 million passengers enplaned or deplaned at Oakland International Airport. [Citation.] The airport complex employs nearly 8,000 people, of which approximately 3,000 are in jobs related to cargo. Airport Servicemen respond to EMT calls over the 2,600 acre airport consisting of two airfields . . . .

"14. Significantly, Airport Servicemen must have 'first response' capability for aircraft fire suppression and rescue. They are required by federal law to respond within three minutes of notice of an aircraft emergency and to have at least one firefighting vehicle in position to begin application of foam, dry chemical, or halon 1211. . . . [Oakland Fire Department] has the responsibility for providing only backup support for aircraft rescue and firefighting operations. . . .

"15. An Airport Serviceman job description dating back to December 7, 1976, and prepared by the Oakland Civil Service Board, provides that an Airport Serviceman '[r]esponds to airport emergency alarms, performs fire suppression and rescue services, utilizing appropriate techniques and equipment. [Citation.] The general statement of duties adds: [¶] 'The scope of the work includes crash/fire/rescue, security, fueling and airfield safety. . . . [¶] . . . From these duty statements it is apparent that Airport Servicemen are intended to operate as an aircraft rescue and firefighting unit . . . .

"16. Oakland International Airport must satisfy certain Federal regulations to obtain and maintain its license with the Federal government. This includes requirements for equipment and personnel who are trained, certified and licensed to use firefighting equipment, to respond to and to suppress aircraft fires, to provide medical services to those who are injured, and to conduct safety and fire prevention inspections . . . . [¶] . . . [¶]

"18. ARFF training and equipment necessarily relate to the rather unique and dangerous nature of aircraft fires. . . .

"19. Oakland Airport has certified to the FAA that it has complied with its guidelines requiring maintenance of an ARFF unit. The above described training, duties and responsibilities of Airport Servicemen make this certification possible. In addition to providing emergency response to aircraft

incidents and calls for medical assistance, Aircraft Servicemen have designated roles under the Airport's Emergency Response Plan for hijackings, bombings, sabotage, water rescue, power failures, structural fires, natural disasters and radiological disasters. . . ."

True, the Servicemen also did aircraft fueling before 1993, conducted security patrols, directed parking of diverted aircraft, and other things. The Board concluded:

"25. When Airport Servicemen were assigned to fueling or security patrol, they were prepared and expected to perform ARFF duties immediately upon notice. This was not true of those [employees] in the fueler classification whose exclusive responsibility was fueling aircraft. CalPERS correctly notes that the reference in section 20433 to those who are only 'occasionally' called upon to perform duties within the scope of active firefighting refers to the percentage of the occasions in which active firefighting services are required in which the position is the principal responder. It is clear that whenever Airport Servicemen were performing fueling operations, they were required to be ready to perform ARFF duties upon notice, one hundred percent of the time.

"CalPERS urges an analysis that would take into account the actual proportion of time spent on fueling prior to 1993. Such an approach would be reasonable only if an Airport Serviceman was exclusively assigned fueling responsibilities and other Airport Servicemen were asked to respond to ARFF duties on a given shift. This was not how Oakland Airport chose to set up its ARFF response. And once the determination was made that all Airport Servicemen were required to be in a state of ARFF readiness, regardless of their daily fueling or security/patrol assignments, they necessarily became engaged in active firefighting duties over the entire shift by virtue of their preparedness to respond. CalPERS can not properly draw a distinction based upon actual time engaged in ARFF duties and non-ARFF duties prior to 1993. The Airport established protocols making ARFF readiness and response capability a universal priority for all Airport Servicemen on a given shift. Under these circumstances Airport Servicemen were not subject to only occasional call. At all times they were in a state of readiness to perform duties within the scope of active firefighting." (Fn. omitted.)

Whether fueling an aircraft, inspecting a runway for debris, or polishing his boots, the Serviceman, while on duty, had one overriding *raison d'être*: If a fire emergency arose, he was to drop other tasks and respond. The City had so assured the federal government as a condition of its airport license.

The City insists "those who are *not* employed as firefighters must have frequent or regular contact with the hazards of active firefighting." "Always being ready to respond . . . falls far short of actually responding and being exposed to the risks of firefighting." We disagree, because the Servicemen *were* employed as firefighters, although they did not spend a lot of time fighting fires: "They also serve, who only stand and wait." (Milton, On His Blindness (1652).)

The cases the City cites do not change our view. For example, in *Charles v. Board of Administration* (1991) 232 Cal.App.3d 1410 [284 Cal.Rptr. 106], the court concluded a paramedic was not entitled to the disability benefits granted to firefighters, in part because his "duties did not expose him to the same risks as a firefighter." (*Id.* at p. 1413; see also *Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1332-1334 [263 Cal.Rptr. 224] (maj. opn.) & *id.* at p. 1346 (dis. opn.); *Ames v. Board of Retirement* (1983) 147 Cal.App.3d 906, 916-917 [195 Cal.Rptr. 453]; *Neeley, supra,* 36 Cal.App.3d at p. 822 ["Active law enforcement implies hazardous activity."].) Here, the Servicemen were exposed to the same risks as firefighters, because their primary duty was to fight airplane fires and perform other dangerous work when airport emergencies arose. (Cf. *Glover v. Board of Retirement, supra,* 214 Cal.App.3d at pp. 1333-1334 ["While Glover's work placed him in daily contact with a limited number of minimum security prisoners, his primary duties—food preparation, cooking and serving meals—were not hazardous."].)

The Attorney General came to a similar conclusion regarding employees of the Monterey Peninsula Airport. "The district firemen provide all of the airport's fire and rescue capacity and meet the firefighting requirement of the Federal Aviation Agency[.] . . . Included in the requirements is the ability of the fire department to meet a number of serious emergency situations, such as aircraft accidents, bomb incidents, structural fires, natural disasters, sabotage, and nuclear attacks." (*Eligibility for Inclusion in Public Employees' Retirement System,* 57 Ops.Cal.Atty.Gen. 179, 182 (1974).) "The duties performed by the Monterey Peninsula Airport District firemen encompass every activity commonly performed by typical firemen, including active fire suppression, rescue work, and emergency medical care. Such employment is 'active firefighting and prevention services' within the meaning of [former] section 20021." (*Id.* at p. 183.) We agree with this view.

CONCLUSION

The PERS Board's resolution of the Servicemen's reclassification request was supported by evidence of their duties and the statutory definition of

"local firefighter." The PERS Board could properly apply its decision retro-actively. No statute of limitations bars the claim. We decline to follow a prior decision of this court (*County of Mono, supra,* 69 Cal.App.4th 1105) to the extent it is inconsistent with the views expressed herein.

### DISPOSITION

The judgment is reversed with directions to deny the City's petition for writ of mandate. The City shall pay the Servicemen's and the PERS Board's costs of this appeal.

Sims, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied February 7, 2002, and the petition of appellant City of Oakland for review by the Supreme Court was denied March 27, 2002. Chin, J., did not participate therein.